## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITES STATES OF AMERICA | : | Hon. Zahid N. Quraishi |
| | : | Mag. No. 20-14001 (ZNQ) |
| v. | : | |
| | : | **APPEAL FROM DENIAL OF BAIL** |
| RAVI PATEL | : | **RELEASE PURSUANT TO 18 U.S.C.** |
| | : | **§§ 3142(f), (g), and (i)** |

**Introduction and Procedural History**

Ravi Patel is a diabetic man currently experiencing pretrial incarceration at Monmouth County Correctional Institution (MCCI). He is charged with the non-violent offenses of conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 1341 and 1349, and identity theft, in contravention of 18 U.S.C. § 1028(a)(3). Dkt. Entry 1. At his initial appearance, Mr. Patel reserved his right to make an application for release. Dkt. Entry 9. He first moved for his release on April 3, 2020, the day that the first cases of COVID-19 were confirmed at MCCI. Dkt. Entry 15. On April 8, 2020, the magistrate judge issued and Opinion and Order which denied Mr. Patel release under 18 U.S.C. §§ 3142(f), (g), and (i). Dkt. Entry 14.

The magistrate judge found that Mr. Patel is diabetic, and that his condition "significantly increases his risk of serious health complications if he were to contract" COVID-19. (*Id.* at 13). But the magistrate judge also found that "Defendant's speculative fear of a [COVID-19] outbreak at MCCI and his subsequent infection" were insufficient to overcome the risk of him fleeing if released. (*Id.* at 15). The court also found that Mr. Patel poses a danger to the community, which "is not outweighed by the speculative concern" that he will contract COVID-19 at MCCI. (*Id.* at 15).

Mr. Patel respectfully seeks *de novo* review under 18 U.S.C. 3145(b) of the denial of his April 3, 2020 application for release under 18 U.S.C. 3142. *See* 18 U.S.C. § 3145(b) ("If a person is ordered detained by a magistrate judge…, the person may file, with the court having original jurisdiction over the case, a motion for revocation or amendment of the order."); see also *United States v. Delker*, 757 F. 2d 1390, 1394 (3d Cir. 1985) ("the Bail Reform Act contemplates de novo determinations in the district court….").

As noted above, Mr. Patel is diabetic, and he is at an elevated risk of death or serious illness if he is infected with COVID-19.[1]  According to the C.D.C., people with diabetes have a 9.2% chance of dying if there are infected with COVID-19. *See* https://www.cdc.gov/ mmwr/volumes/69/wr/mm6913e2.htm.  Thus Mr. Patel faces a dire risk of death if infected, and as will be argued below, he is at increased risk of infection if he remains detained at MCCI.  That risk, and the risk that our healthcare system will be overwhelmed if too many people get sick at once, outweighs whatever risk of flight or danger to the community can be said to be present in this case.  Moreover, a combination of conditions can reasonably assure this Court of Mr. Patel's return to court and the safety of the community.

**The COVID-19 National Emergency**

The magistrate judge described the COVID-19 pandemic as "a national crisis unparalleled since World War II," and recognized that the crisis is particularly acute in New York and New Jersey.  Dkt. Entry 15 at 2.  Importantly, the court also noted that because there is no vaccine "radical social distancing measures [are] the only method to prevent the spread of the

---

[1] The government claims in their response to the defense motion for release that Mr. Patel has "refused" insulin on several occasions during his period of incarceration at MCCI, and the magistrate judge adopted this language of "refusal" in its Opinion. Dkt. Entry 14 at 14.  Mr. Patel did not "refuse" his insulin.  He has been living with type-2 diabetes since 2009.  He is offered insulin every day, and he decides whether to take it or abstain based on his daily blood sugar tests.  It is dangerous for someone with type-2 diabetes to take insulin when their blood sugar levels are normal because it can cause hypoglycemia.

virus and, consequently, limit the number of those infected with the disease and shield our healthcare system from collapse." (*Id.* at 2).

Almost no aspect of life in the United States has been unaffected by virus and the drastic measures that have been undertaken in response. Schools and non-essential businesses have been closed for weeks and are likely to remain so indefinitely. Court operations have been suspended or are being conducted on a limited basis by video and telephone conference. Americans have been told to stay home, and as a result life has largely ground to a halt for tens of millions of people.

Early in the crisis, jails and prisons were identified as institutions that are particularly likely to experience outbreaks of COVID-19. *See* Jan Ransom and Alan Feuer, "A Storm Is Coming: Fears of an Inmate Epidemic as the Virus Spreads in the Jails," NYTimes, March 20, 2020. *Available at*: https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html. These predictions were grounded in the fact that the only preventative measures known to be effective – social distancing and vigilant handwashing – are difficult if not impossible to achieve in a jail setting. As an epidemiological consensus formed, a host of correctional health experts began to sound the alarm, calling for rapid reductions in jail and prison populations. *See* Dkt. Entry 15, Exhibit B, Declaration of Dr. Marc Stern.[2] Some government officials and courts have heeded their call. In New Jersey, the State Supreme Court released a large class of defendants serving time in county jail "in light of the Public Health Emergency. *See In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020). On April 10, 2020, New Jersey Governor Phil Murphy signed

---

[2] The defense maintains additional declarations on file from several correctional and public health experts that have been submitted in jurisdictions across the country. These experts draw the same conclusions about the inability to socially distance or achieve the necessary level of personal hygiene in jail. They express the opinion that officials should work to reduce jail and prison populations quickly to protect vulnerable inmates and society at large. These materials can be made available to the Court upon request.

Executive Order No. 124, which establishes a process to grant temporary reprieve to certain at-risk inmates who are serving prison sentences over 364 days. *Available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-124.pdf.

In this District, a court recently released a class of five medically vulnerable detainees from immigration custody, including two who suffer from diabetes and have criminal records. *Cristian A.R., et. al. v. Thomas Decker* No. 20-cv-03600 (D.N.J. April 12, 2020) ("Petitioners in this matter are vulnerable to severe complications and death if they contract COVID-19 and are incarcerated in Facilities at the epicenter of the outbreak where they cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene to stop the spread of the virus. These facts warrant the extraordinary remedy of release on bail, and make bail necessary, to make the habeas remedy effective."). And a court in this District has granted temporary release under 18 U.S.C. § 3142(i) based on defendant's medical vulnerability to COVID-19. *United States v. Duncan*, No. 19-mj-6717 (D.N.J. Apr. 6, 2020).

**The Highest Known Infection Rates for COVID-19 Are Inside Jails and Prisons**

The epidemiological consensus that jails, prisons, and other congregate environments are at particular risk of COVID-19 outbreaks has been proven correct to a disturbing degree by actual events. In New York City, Rikers Island reported its first confirmed COVID-19 case on March 18, 2020. It now has one of the highest known infection rates in the world, with 334 confirmed cases out of a population of 4,105, for an infection rate of 8.14%. *See* https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/. By way of comparison New York City as a whole – the city at epicenter of the pandemic in the United States – has an infection rate of 1.31%. (*Id.*) The Rikers Island numbers likely underreport the actual incidence

of COVID-19 there due to a lack of widespread testing. They also do not account for sick individuals who have died or have been released from the jail.

Cook County Jail in Chicago is experiencing a similarly explosive outbreak. On March 23, 2020, the jail reported its first two COVID-19 cases. As of April 13, 2020, more than 500 people have tested positive for COVID-19 at the jail, and three have died. *See* https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagos-cook-county-jail.

The first reported infection of a federal inmate occurred on March 23, 2020. As of April 14, 2020, the BOP has reported 466 infected inmates and 261 infected staff. 14 inmates have died.

**COVID-19 and Monmouth County Correctional Institution**

MCCI reported its first two cases of COVID-19 on April 3, 2020. The magistrate judge reviewed information about the jail's COVID-19 response and found that it had "established strict protocols to protect the prison population, including Defendant, from being exposed to the virus and to detect and stop its spread." Dkt. Entry 14 at 14. The court adopted the wait-and-see approach employed in *United States v. Clark*, No. 19-40068-01, 2020 WL 1446895 (D. Kan. Mar. 25, 2020). [3] In *Clark,* a diabetic inmate was denied pretrial release because the court found risk of an outbreak of COVID-19 at the jail was "speculative;" that release would not reduce the risk of COVID-19 infection but just "[trade] one set of problems for another;" and that the

---

[3] In *Clark* the defendant is charged with a drug trafficking conspiracy that resulted in the reasonably foreseeable death of another, exposing him to a sentence of 20 years to life. As such he was subject to the rebuttable presumption under 3142(e)(3)(A) that no condition or combination of conditions will reasonably assure his appearance or the safety of the community. Mr. Patel is not subject to that presumption. And while the allegations in Mr. Patel's case are serious, no one died. If convicted, Mr. Patel faces no mandatory minimum sentence, and the government estimates his advisory guideline range to be 27 to 33 months. Dkt. Entry 17 at 9. The magistrate judge also cited to *Hamilton* and *Williams,* both of which are cases where COIVID-19 bail applications were denied. (Opinion 6-8). *Hamilton* involved a defendant charged with conspiracy to commit murder. And in *Williams* the defendant was an otherwise healthy 67-year-old. *See United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020) and *United States v. Williams*, No. 13-544, 2020 WL 1434130 (D. Md. Mar. 24, 2020).

although jail conditions do not permit "optimal" social distancing, other "meaningful measures" are in place which are sufficient. (*Id.* at 7).

But *Clark*, and the court below, take too sanguine a view of the ability of any individual jail to control the spread of COVID-19 within its walls. If this Court waits for the invisible menace of COVID-19 to make itself seen and felt further at MCCI, it will do so at great risk to Mr. Patel.

**The Risk of COVID-19 at Monmouth County Correction Institution is Not Speculative**

At the time *Clark* was decided on March 25, 2020, there were no confirmed cases of COVID-19 inside Leavenworth Detention Center, where the defendant was detained. *Clark* at 5. That is not the case at the MCCI. As of April 3, 2020, there were two confirmed cases of inmates at MCCI with COVID-19. Those inmates first exhibited symptoms of COVID-19 several weeks ago, and as a result they were quarantined inside the medical unit within the jail. Dkt. Entry 17 at 3.

Confirmation that COVID-19 has been inside the MCCI for several weeks is an alarming development. The virus is invisible, highly contagious, and up to 50% of those infected may be asymptomatic. *See* https://www.npr.org/2020/04/06/828061364/fauci-half-of-those-with-coronavirus-may-have-no-symptoms. The lack of capacity to test for COVID-19 means it is effectively undetectable; at MCCI only three inmates have been tested. Correctional health experts believe that once the virus is present in a facility it will spread faster there than it would in the community at large because of the extreme difficulty in implementing social distancing and vigilant handwashing. This is precisely what has happened at Rikers Island, Cook County Jail, and in BOP facilities around the country. As the court in *Cristian A.R., et. al.,* recognized, "in truth, avoiding exposure to COVID-19 is impossible for most detainees and inmates."

*Cristian A.R., et. al* at 2.  It is clearly not speculative to expect an outbreak at MCCI; rather, it is an inference that finds strong support both in expert opinion and grim experience.

The fact that there was a two-week delay between when these individuals fell sick and when the jail announced that they had tested positive for COVID-19 should give this court pause. A wait-and-see policy has no realistic chance of success if the jail is unable or unwilling to provide accurate and timely information about the spread of the virus behind its walls.

**The Measures Taken at MCCI to Combat COVID-19 Do Not Effectively Address the Present Crisis**

The only measures that known to be effective in stopping the spread of COVID-19 are social distancing and vigilant handwashing.  The protocols now in place at MCCI do not include social distancing or vigilant hand washing; such measures are practically impossible to implement in a jail setting.  Correctional health experts have argued that the only way to protect medically vulnerable individuals like Mr. Patel is to release them from jail.

In the absence of widespread testing, it is impossible to know the true extent to which the virus has spread within the jail walls.  But for the jail to credibly claim that the infections are limited to two inmates, it would have to provide significantly more information than it has to this point.  The court below drew its conclusions about the effectiveness of the jail's protocols without the benefit of critical information.  To date the jail has not disclosed what it knows about how the inmates became infected, whether they had contact with each other, or whether they were infected separately through community spread of the virus.  The jail has not indicated that it has made any effort to establish who the sick inmates had contact with inside the jail in the days before they were quarantined.  Nor has the jail disclosed how long the sick individuals were incarcerated before they exhibited symptoms.  In the absence of this information it is speculative to assume that the confirmed cases are the only cases of COVID-19 at MCCI.

Even if the sick individuals were recent arrivals to the jail who brought the virus in themselves, this simply demonstrates one of the major risk factors in the jail setting. Newly arriving inmates and Corrections Officers continue to cycle through the jail, and they are perfect vectors for introducing and reintroducing the virus with each shift change. The jail has indicated that all its screening efforts are centered around the detection of symptoms. Dkt. Entry 17, 3-4. This protocol will not detect all instances of infection given that up to 50% of carriers do not exhibit any symptoms at all. Clearly, testing of newly arrived inmates and correctional officers at the beginning of their shift will not stop the virus.

The magistrate judge made a finding of fact that the preventative measures currently in place at Monmouth County Correctional Institution "appear, at least for now, to be effective." Dkt. No. 14 at 15. But appearances have proven to be deceptive when it comes to the invisible threat of COVID-19. For example, we now know that COVID-19 was already inside the jail on March 20, 2020, when Monmouth County Sheriff Shaun Golden held a press conference and stated that the inmates at the jail were "all in good health." *See* Suzanne Cervenka*, Monmouth County Jail: No coronavirus cases thanks to screening, quarantine measures*, March 21, 2020, Available at: *https://www.app.com/story/news/local/emergencies/2020/03/21/no-coronavirus-cases-monmouth-jail-thanks-screening-quarantine-steps/2882761001/.*

Locking inmates in their cells for 23 ¾ hours a day may feel like decisive action, but its effectiveness is undermined by the fact that inmates continue to share a limited number of showers and telephones. And adding hand sanitizer dispensers in high traffic areas and in the medical holding tank is necessary, but not the same thing as providing supplies that permit everyone in the jail can wash their hands repeatedly and whenever necessary throughout the day.

The appearance that the situation inside MCCI is under control is almost certainly an illusion. In the absence of widespread testing there is simply no way to know the current extent to which the virus has spread within MCCI.

**Releasing Mr. Patel Under Condition of Home Confinement with an Approved Third-Party Custodian Would Reduce Overall Risk to Mr. Patel and the Community At Large**

Releasing Mr. Patel would not simply trade one set of health risks for another. Instead it would both reduce the specific risk to Mr. Patel and the general risk to the community at large. He proposes that he be confined to the home of a close family friend. Inside that home he would be able to practice social distancing and maintain elevated standards of hygiene.

Even every day essential activities like grocery shopping now involve some degree of risk. But the Centers for Disease Control and Prevention has issued guidance to Americans explaining that those risks can be reduced by remaining at home and avoiding non-essential interactions with others. Clearly, Mr. Patel will be better able to follow these recommendations if he is confined to a private home than if he remains in a congregate setting in jail. By doing so he will protect his own health and reduce the risk that he will need the assistance of our overburdened healthcare system.

**There is Little Risk of Flight**

The magistrate judge identified certain factors in support of its conclusion that Mr. Patel is a "severe" flight risk. Specifically, the court considered his "little connection to New Jersey, significant ties to India, a history of nonappearance, Defendant's likely access to fraudulent identifications, an inability to provide collateral, and his attempts to leave the country." Dkt. Entry 14 at 14. However, Mr. Patel respectfully argues that this holding overstates the actual

extent of risk of flight in this case.  Moreover, there is a combination of conditions which can reasonably ensure Mr. Patel's return to court.

Mr. Patel does have ties to New Jersey, in the form of the third-party custodian who has been approved by Pretrial Services.  She is a close family friend who is willing to take responsibility for him if he is released.  Mr. Patel's ties to India are not a bar to his release on this case.  Indeed, courts routinely release defendants who have strong merits arguments under the Bail Reform Act even when they are subject to various stages of deportation, including final orders of removal. *See United States v. Soriano Nunez*, 928 F.3d 240 (3d Cir.); *United States v. Lizardi-Maldonado*, 275 F. Supp. 3d 1284, 1288 (D. Utah June 28, 2017) (ordering release of defendant without legal status who was subject to a final removal order and had repeatedly reentered the country after four prior deportations); *United States v. Hernandez-Bourdier*, No. 16-cr-222, 2017 WL 56033 (W.D. Pa. Jan. 5, 2017) (ordering release of defendant without legal status); *United States v. Clemente-Rojo,* No. 14-cr-10046, 2014 WL 1400690, at *3 (D. Kan. Apr. 10, 2014) (ordering release of defendant without legal status who had reentered country after prior deportation and was subject to deportation order); *United States v. Wang*, No. 13-cr-20133, 2013 WL 6843003, at *3 (D. Kan. Dec. 27, 2013) (ordering release of defendant without legal status); *United States v. Blas*, No. Crim. 13-178, 2013 WL 5317228 (S.D. Ala. Sept. 20, 2013) (ordering release of defendant without legal status who had reentered country after prior deportation).

Mr. Patel's only prior conviction is for charges that stem from this same investigation, but which were prosecuted in state court.  The defense leaves the issue of whether this subsequent prosecution is appropriate for another motion.  But Mr. Patel's conduct during the pendency of those state charges is relevant here.  He was arrested on September 11, 2019 and

released to home detention with electronic monitoring on September 25, 2019. He followed the rules of his release assiduously, never missing a court date or violating the conditions of his home confinement. Thus, the Court has recent, compelling evidence that the conditions of release suggest here – release to home confinement with location monitoring at the home of an approved third-party custodian – will reasonably ensure his return to court.

Considered in the light of his excellent conduct during his recent period of home confinement, Mr. Patel's prior instances of non-appearance are relatively innocuous. Indeed, these warrants were known during the state court proceedings and did not prevent his release there. In 2007 he was charged in a case related to his alleged failure to settle a $273 debt with an automotive dealership. Mr. Patel has lived in India for most of the subsequent 13 years. He did not have the opportunity or occasion to clear up this warrant. Another apparent warrant was issued in Florida in 2014; the defense has no additional information about that case.

The fact that Mr. Patel sought to leave the country after the imposition of his sentence of probation is not evidence of risk of flight. Mr. Patel had no forewarning that the federal government would bring additional charges against him. On the contrary, his lawyer had been informed that the federal government would not do so. Mr. Patel made his travel plans openly, under his own name, with the assistance of his counsel and in consultation with the state court and prosecutor. He scheduled his flight in such a way that it would permit him to attend his state court sentencing. His attorney actively sought the return of Mr. Patel's passport, and when the state could not provide it, she petitioned the court for permission to modify the conditions of his release to permit him to go to the Indian Consulate in Manhattan to apply for new travel documents. *See* Dkt. Entry 15, Exhibit C, *New Jersey Superior Court Order Permitting Mr. Patel to Travel to New York City to Obtain Travel Documents*. While it is true that Mr. Patel

was found to possess fraudulent identification at the time of his arrest, he never used this identification to attempt to travel.  He booked his flight under his own name.  His passport is in the possession of federal law enforcement officials.  Mr. Patel's continued presence in the United States was unlawful.  His efforts to leave the country reflect his desire to abide by the law of the United States.

Finally, Mr. Patel is indigent and like many indigent people he cannot provide collateral to secure his release.  However, he and his third-party custodian are willing to sign on to a bond in this case, which should be sufficient to secure his return to court.

**There is Little Risk of Danger to the Community**

The court below concluded that Mr. Patel represents a danger to the community because of "the risk and ease at which Defendant could resume his participation in the alleged fraud." Dkt. Entry 14 at 15.  However, the government has not alleged that Mr. Patel continued to commit economic crimes or crimes of any kind while he was release on home confinement from September 25, 2019 until his arrest on this case in January 2020.  His law-abiding conduct during his three months of home confinement while released on that case is strong evidence that he does not present a danger to the community now.

Moreover, Mr. Patel's alleged role in the conspiracy was to travel to various locations to pick up packages containing money.  Dkt. Entry 1, 5-8.  There is no allegation that he participated in using the telephone or internet to induce victims to part with their money.  Under the government's theory that role seems to have been played by others.  It would not be possible for Mr. Patel to assume his alleged role in the conspiracy under the conditions of house arrest and electronic monitoring.

Finally, Mr. Patel's lack of income will not create a "strong incentive for him to continue the alleged conduct upon release." Dkt. Entry 14 at 15. While he has limited personal resources, he will be staying at the home of a close family friend, and he will have their financial support.

**Forms of Release Under the Bail Reform Act**

Mr. Patel argued below that he is entitled to immediate release because the government has failed to establish that he is a "serious" flight risk, or any other condition required 18 U.S.C. § 3142(f) factor that would permit the government to seek detention in this case. Serious flight risk is a high standard, and it requires "extreme and unusual circumstances." Dkt. Entry 15 at 3. The magistrate judge found that Mr. Patel is a "severe" flight risk and proceeded to consider the parties arguments for and against detention. Dkt. Entry 14 at 14. Mr. Patel asks for *de novo* reconsideration of whether the government has carried their burden of establishing that Mr. Patel is a "serious" risk of flight, and whether they were entitled to a detention hearing in this case.

In the alternative, Mr. Patel argued below that even if the government had made a sufficient showing that he is a serious risk of flight, his elevated risk of death form COVID-19 due to his diabetes is a "physical condition" under 18 U.S.C. § 3142(g) that entitles him to release. The court below considered the risks to Mr. Patel if he remains detained and found that it was outweighed by the risk that he will flee and his danger to the community. Mr. Patel seeks *de novo* reconsideration of this ruling.

Mr. Patel did not previously move for temporary release under 18 U.S.C. § 3142(i), but the court below considered the defense arguments under the compelling circumstances standard of that section of the Bail Reform Act. The court denied him temporary release. Mr. Patel seeks *de novo* reconsideration of this ruling.

**Conclusion**

13

For the reasons stated above, Mr. Patel should be released on the condition that he remain in home detention and  under electronic monitoring at the home of an approved third-party custodian.

Respectfully submitted,

/s/ Benjamin West

Benjamin West
Assistant Federal Public Defender
District of New Jersey
(609) 649-8364
benjamin_west@fd.org

Certificate of Service

I, Benjamin J. West, Assistant Federal Public Defender, herby certify that I served the foregoing Notice of Appeal and Brief in support of Appeal on the United States of America (Meriah Russell, Esq., Assistant United States attorney), bu filing both on the Court's ECF on this 15th day of April, 2020.

/s/ Benjamin West